**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA	PLAINTIFF

v.	NO. 4:13CR00158 JLH

MARTHA ANN SHOFFNER	DEFENDANT

**OPINION AND ORDER**

A jury found Martha Ann Shoffner guilty of six counts of extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951(a); one count of attempted extortion in violation of the same act; and six counts of taking bribes in violation of the federal program bribery statute, 18 U.S.C. § 666(a)(1)(B). At trial, Shoffner moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The Court reserved ruling on that motion. Following the jury verdict, Shoffner renewed her motion. For reasons that will be explained, Shoffner's motion for judgment of acquittal is denied.

**I. THE FACTS**

Shoffner was elected Treasurer for the State of Arkansas in 2006, and she assumed office on January 1, 2007. She was reelected in 2010 and began her second term on January 1, 2011.

The state treasurer has the duty to receive and keep state funds and to disburse those funds upon warrants drawn upon the state treasury. Ark. Code Ann. § 25-16-604. Not all of the funds maintained by the state treasurer, however, are needed for immediate disbursement, so the state treasurer invests a portion of those funds in bonds, reserving sufficient liquid assets to meet the state's obligations until the bonds mature. Investments in bonds are made through brokers. The state treasurer maintains a list of brokers approved for the purpose of investing state funds.

Steele Stephens was a licensed bond broker doing business in the State of Arkansas. His father, Steve Stephens, also a bond broker, was from Shoffner's hometown of Newport, Arkansas. Steele Stephens, however, was not acquainted with Shoffner before she took office as the state treasurer. During Shoffner's first term as state treasurer, the two Stephenses maintained their licenses with an entity called Apple Tree Investments, Inc. While the Stephenses worked with Apple Tree, the two of them went with a principal from Apple Tree to Shoffner's office and requested that they be placed on the list of firms approved for investing state funds in bonds. Shoffner agreed, and placed them on that list. Later, the Stephenses moved their affiliation from Apple Tree Investments to St. Bernard Financial Services, Inc., and the approval for investing state funds accompanied them.

Sometime in the first half of 2010, Shoffner approached Steele Stephens and asked if he could help her purchase a place where she had been living but which was going through foreclosure. Stephens looked at the property and concluded that it was not a good investment nor a place where a single woman could safely reside. He also thought that it would be risky for him to have his name on a mortgage encumbering the state treasurer's residence. Rather than purchase that place for her, Stephens agreed to pay Shoffner $1,000 a month so that she would have funds to rent an apartment in Little Rock while maintaining her home in Newport. Due to the risks involved in making a monthly payment of $1,000, Stephens and Shoffner agreed that they would meet approximately every six months for him to pay her $6,000. According to Stephens, he met with Shoffner on six different occasions between mid-2010 and December of 2012 for the purpose of making the promised payment of $6,000 on each occasion. On each occasion Stephens paid Shoffner the $6,000 in $100 bills.

All of the bond brokers on the state treasurer's approved list generally have the same bond issues available for investment by the state. Because there is rarely any material difference between the bonds available to different brokers, the practice of the state treasurer's office generally has been to spread the investments among the approved brokers on an approximately equal basis. That practice changed after Stephens began paying Shoffner. By October 19, 2011, Stephens had amassed a portfolio of state investments totaling $533,800,000.00, while the next largest total with a single broker was $170,000,000.00, followed by a broker with $135,000,000.00, and another at $131,000,000.00, and one at $100,000,000.00.[1] The evidence established that this disproportionate share of the state's investment business was given to Stephens at Shoffner's direction, over her staff's objection.

Another change also occurred after Stephens began paying Shoffner. Over the years, bond brokers periodically had requested, unsuccessfully, that the state treasurer's office give them reports showing the entire portfolio of investments made by the state treasurer. That information would allow one broker to see the investments made by the state through other brokers so that the broker with that information would know when bonds invested through another broker would mature. When bonds mature, those funds come back into the state treasury and, typically, would be reinvested with the broker who had sold the bonds that had matured. With information about other brokers' investments, however, a broker could attempt to persuade the treasurer to invest those funds with him rather than with the broker who had previously invested those funds. Before Stephens began paying Shoffner, the state treasurer had never provided a broker with information about the portfolios held by other brokers. Shoffner, however, began providing Stephens with information

---

[1] *See* government Exhibit 31. The remaining six brokers on the approved list had totals ranging between $0.00 and $90,000,000.00.

3

regarding the entire portfolio of the state treasurer's investments, which gave him a competitive advantage over the other brokers. Again, this change in practice was instituted by Shoffner over her staff's objections.

By the second half of 2011, the disproportion between the state's investment business allotted to Stephens and that of the other brokers began to draw attention. Auditors from the Division of Legislative Audit examined the records of the state treasurer's office and issued two special reports, in addition to the reports generated by the annual audits, regarding this topic. The Legislative Joint Auditing Committee also conducted two hearings on this topic. At one of those hearings, a legislator asked Shoffner whether she had received any payments from Stephens, and she denied that she had. During this same time, the relationship between Stephens and Shoffner received a great deal of scrutiny in the news media.

In April of 2012, Stephens purchased a cell phone for Shoffner for use in their communications. As Stephens described it, the cell phone was in no one's name. Minutes would be added in advance either by purchasing a card or going online to add minutes.

By late 2012 or early 2013, the Federal Bureau of Investigation had opened an investigation into Shoffner's relationship with Stephens. In January of 2013, the FBI interviewed Stephens, who confessed that he had been paying Shoffner $6,000 every six months and that he had made six such payments. Stephens agreed, in return for a promise of immunity, to cooperate with the investigation. Thereafter, in January of 2013, Stephens went to Shoffner's house wearing an audio recording device and recorded their conversation. In May of 2013, Stephens took $6,000 of FBI money to Shoffner's residence in Newport while wearing an audio and video recording device. As he had done on two previous occasions, Stephens took a pie in a pie box, with sixty $100 bills concealed

inside the pie box. Shoffner accepted the pie box, acknowledged the money, and engaged in a lengthy conversation with Stephens in which she told him, among other things, that she had thrown the cell phone that he had given her into a river between Little Rock and Newport.

Shortly after this recorded conversation between Shoffner and Stephens concluded, FBI agents executed a search warrant at Shoffner's residence. The agents found the $6,000 concealed in a cigarette carton in a drawer in her kitchen. The agents asked Shoffner if there were any other funds on the premises that she had received from Stephens, and she directed them to a place where she had hidden $4,020 from a previous transaction.

Each of the $6,000 payments by Stephens to Shoffner was charged as two separate offenses — a violation of the Hobbs Act and a violation of the federal program bribery statute. The one instance in which Stephens gave Shoffner $6,000 in funds provided by the FBI was charged as an attempted extortion in violation of the Hobbs Act.

## II. THE STANDARD OF REVIEW

Federal Rule of Criminal Procedure 29(a) provides that after the government closes its evidence or after the close of all of the evidence, the court on the defendant's motion must enter a judgment of acquittal with respect to any offense for which the evidence is insufficient to sustain a conviction. Rule 29(b) provides that the court may reserve decision on the motion, proceed with the trial, submit the case to the jury, and decide the motion after the jury returns a verdict of guilty. "The standard of review governing sufficiency-of-the-evidence challenges is extremely deferential to the underlying guilty verdict and raises a high bar for a defendant to overcome[.]" *United States v. Wells*, 646 F.3d 1097, 1102 (8th Cir. 2011). The evidence must be viewed in the light most

favorable to the guilty verdict, which can be reversed only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id*.

### III. THE HOBBS ACT

The Hobbs Act provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Extortion means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

Shoffner challenges the sufficiency of the evidence on the Hobbs Act conviction on two grounds. First, she contends that the evidence fails to show that the alleged extortion affected interstate commerce. Second, she contends that under the Hobbs Act, "the Defendant's conduct must constitute an acceptance of money by a public official in exchange for *a specific exercise* of his or her official power." Document #73 at 8 (emphasis added). We begin with Shoffner's second argument.

#### A. THE *QUID PRO QUO* REQUIREMENT

The Hobbs Act is violated whenever a public official uses color of official right to obtain property to which he is not entitled and thereby affects interstate commerce. *United States v. Brown*, 540 F.2d 364, 372 (8th Cir. 1976), *abrogated on other grounds by Dalton v. United States*, 862 F.2d 1307, 1310 (8th Cir. 1988); *see also United States v. French*, 628 F.2d 1069, 1071 (8th Cir. 1980)

(citing *Stirone v. United States*, 361 U.S. 212, 218, 80 S. Ct. 270, 273, 4 L. Ed. 2d 252 (1960)).[2] Although the Hobbs Act may be violated when a public official takes a bribe, *see Evans v. United States*, 504 U.S. 255, 268, 112 S. Ct. 1881, 1889, 119 L. Ed. 2d 57 (1992), bribery is not the only means by which that act may be violated. *See, e.g.*, *Nat'l Org. for Women, Inc. v. Scheidler*, 396 F.3d 807, 813 (7th Cir. 2005) (citing *Stirone*, 361 U.S. at 215, 80 S. Ct. at 270). Shoffner argues that, subsequent to *Brown*, the Supreme Court narrowed the scope of the language "under color of official right" so as to require an exchange of money for a specific exercise of the official's power.

In *McCormick v. United States*, 500 U.S. 257, 111 S. Ct. 1807, 114 L. Ed. 2d 307 (1991), the Supreme Court held that when a public official receives campaign contributions, the receipt of those contributions constitutes extortion under color of official right in violation of the Hobbs Act only "if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 273, 111 S. Ct. at 1816. Shoffner concedes that the holding in *McCormick* limits its holding to cases in which a public official receives campaign contributions. *Id.* at 274 n.10, 112 S. Ct. at 1817 n.10 (declining to decide whether a *quid pro quo* requirement exists "in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value"). She concedes that the payments at issue here were not campaign contributions. Nevertheless, Shoffner contends that in *Evans* the Supreme Court extended *McCormick* to all cases in which a public official receives funds to which he is not entitled.

*Evans*, like *McCormick*, was a case in which a pubic official received money allegedly in return for an official act. Part of that money was a campaign contribution, but part of it was not.

---

[2] The Manual of Eighth Circuit Model Criminal Jury Instructions (2013) § 6.18.1951, which the Court adopted at trial, follows *Brown*. By convicting Shoffner on the bribery counts, however, the jury necessarily found that Shoffner took money from Stephens in return for being influenced to or rewarded for increasing his business with the state.

7

While the issue presented was whether the word *induced* in the Hobbs Act applies to extortion "under color of official right," the Court's opinion addressed more broadly the meaning of the Hobbs Act, construing the Act in light of the common-law definition of extortion:

> At common law, extortion was an offense committed by a public official who took "by colour of his office" money that was not due to him for the performance of his official duties. A demand, or request, by the public official was not an element of the offense. Extortion by the public official was the rough equivalent of what we would now describe as "taking a bribe."

*Evans*, 504 U.S. at 260, 112 S. Ct. at 1885 (footnotes omitted).[3] Thus, in *Evans*, the Court held "that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was in return for official acts." *Id*. at 286, 112 S. Ct. at 1889. Contrary to Shoffner's argument, *Evans* requires that the payment be made "in return for official acts," not in exchange for "specific official acts." *See United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2004) (the Hobbs Act does not require "some explicit, direct link with a promise to perform a particular, identifiable act when the illegal gift is given to the official."); *United States v. Ganim*, 510 F.3d 134, 145 (2d Cir. 2007) (rejecting the argument "that the benefits received must be directly linked to a particular act at the time of the agreement"). Moreover, unlike *McCormick*, *Evans* does not require an explicit promise or undertaking. Rather, "[t]he official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing

---

[3] In a footnote to this passage, the Court cited 4 W. Blackstone, Commentaries *141 for the proposition that common-law extortion was "an abuse of public justice, which consists in an officer's unlawfully taking, *by colour of his office*, from any man, any money or thing of value, that is not due to him, or more than is due, or before it is due." *Id*. at n.4 (emphasis added by the Court). A dissenting opinion in *Evans* contended that the Court misconstrued the common-law definition of extortion. *Id*. at 281-84, 112 S. Ct. at 1896-97. According to the dissent, common-law extortion under color of right required that the official obtain property by claiming entitlement thereto by virtue of his office, which distinguished common-law extortion from common-law bribery, where both parties knew that the official was not entitled to the property that the official obtained. *Id*.

winks and nods." *Evans*, 504 U.S. at 274, 112 S. Ct. at 1892 (Kennedy, J., concurring); *see Abbey*, 560 F.3d at 518.

Here, the course of dealing between the parties provides ample evidence from which the jury could reasonably conclude that Shoffner received six $6,000 payments from Stephens in exchange for directing the state's investments to him. As noted above, the historic practice of the treasurer's office had been to allot the state's investment business among the approved brokers in approximately equal amounts. After Stephens began making payments to Shoffner, that practice changed dramatically, to Stephens's benefit. By October 19, 2011, Stephens had a portfolio of bonds in which state funds were invested that dwarfed the portfolios of his competitors. Likewise, the practice of the state treasurer's office had been to deny requests from brokers to see the state's investment portfolio, but after Stephens began making payments to Shoffner, Shoffner provided those investment portfolio reports to Stephens, which gave him a competitive advantage. The jury could reasonably conclude that the favoritism showed to Stephens by Shoffner resulted from his payments to her.

Furthermore, after attention was drawn to Stephens's disproportionate share of the state's investment business, Stephens purchased for Shoffner a cell phone on which they could discuss their business without creating a record of their telephone conversations on a telephone bill in Shoffner's name. And, after the FBI began its investigation, Shoffner threw that telephone into a river. These actions by Stephens and Shoffner are further evidence that they intended that the payments be exchanged for Shoffner's directing the state's investment business to Stephens.

The government proved that Shoffner accepted payments from Stephens in exchange for directing the state's bond transactions to him. Hence, the government proved that Shoffner used her office to obtain funds to which she was not entitled.

**B.      THE REQUIREMENT OF AN EFFECT ON INTERSTATE COMMERCE**

The Eighth Circuit has held that Hobbs Act extortion "requires an actual effect on interstate commerce, not just a probable or potential impact." *United States v. Williams*, 308 F.3d 833, 838 (8th Cir. 2002). An attempted extortion, however, requires only a potential effect on interstate commerce. *United States v. Foster*, 443 F.3d 978, 984 (8th Cir. 2006).

Shoffner conceded at trial that the bond transactions occurred in interstate commerce, but she contends that "the obtaining of property from another" must affect interstate commerce. Document #73 at 4. More specifically, Shoffner's argument is that the government had to prove that depriving Stephens of $6,000 affected interstate commerce. That argument is based in large part on a line of cases in which a defendant was charged with robbery under the Hobbs Act. *See, e.g., United States v. Quigley*, 53 F.3d 909, 910-11 (8th Cir. 1995) (holding that robbing individuals rarely affects interstate commerce). Shoffner cites no cases, however, that extend this reasoning to cases involving extortion under color of official right.

In a typical instance of robbery, the means used to effectuate the robbery are force, violence, or threats. *See* 18 U.S.C. § 1951(b)(1). None of these means has any intrinsic connection to interstate commerce, so, typically, the connection to interstate commerce must be found in the effect, not the means, of the taking.

The same logic does not apply, however, to extortion under color of official right. Public officials often have leverage over a segment of interstate commerce and can use that leverage as a

means of extorting funds. Here, for example, the duties of the Arkansas state treasurer include investing hundreds of millions of dollars of state funds in bond transactions that occur in interstate commerce. Shoffner used her "official right" to direct these bond transactions to obtain payments from Stephens. Therefore, the means by which Shoffner obtained payments — her official right to direct bond transactions — affected interstate commerce.

In *United States v. Foster*, the Eighth Circuit implicitly recognized that affect on interstate commerce required by the Hobbs Act is satisfied where an officeholder uses his authority over a transaction that occurs in interstate commerce to obtain payments to which he is not entitled. In *Foster*, the defendant was an alderman. The alderman obtained funds from an investor who needed approval from the city council to convert a hotel to an independent living facility for the elderly. That the project would have affected interstate commerce was sufficient to establish the effect on interstate commerce required by the Hobbs Act. *Foster*, 443 F.3d at 984.

Shoffner's "official right" gave her leverage over a substantial amount of interstate commerce. She used that "official right" to obtain payments from Stephens to which she was not entitled. It was the exercise of her leverage over interstate commerce, not the effect of depriving Stephens of $6,000, that established the necessary effect on interstate commerce. For the six counts of extortion under color of official right, the government proved that the extortion had an actual effect on interstate commerce; and on the count of attempted extortion, the government proved a potential effect.

## IV.  FEDERAL PROGRAM BRIBERY

Shoffner moves for judgment of acquittal on the federal program bribery charges based on three arguments. First, she argues that the government did not trace any specific federal funds to

11

her control. Second, she argues that there was no evidence that any federal funds in the Arkansas state treasury were "benefits" as required by the statute. Third, she contends that the statute is unconstitutional as applied to her because there is no direct federal interest in the operation of the Arkansas state treasury or her conduct in this case.

The federal program bribery statute provides, in pertinent part:

> Whoever, if the circumstance described in subsection (b) of this section exists —
>
> (1) being an agent of . . . a State . . . government . . .
>
> * * *
>
> (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more . . .
>
> shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a). Subsection (b) provides:

> The circumstance referred to in subsection (a) of this section is that the . . . government . . . receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

*Id*. § 666(b). While the statute does not define the term "benefits," the statute excludes "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business," from its purview. *Id*. § 666(c).

This statute is quite broad. As applied to this case, the statute provides that anyone who is an agent of a state government and who corruptly solicits, demands, accepts, or agrees to accept anything of value from any person in return for being influenced or rewarded in connection with any business involving anything of value of $5,000 or more has violated the statute, provided that the

government receives in any one year period benefits in excess of $10,000 under any form of federal assistance.

Shoffner's argument that the government failed to trace specific federal funds to her control is based on erroneous construction of the statute. Contrary to her argument, the statute does not require that any specific federal funds be traced to the control of the defendant. *Sabri v. United States*, 541 U.S. 600, 605-06, 124 S. Ct. 1941, 1946, 158 L. Ed. 2d 891 (2004).

Shoffner's other arguments go primarily to the weight of the evidence, and she is mistaken in her interpretation of the evidence. Richard Weiss, the Director of the Department of Financial and Administration, testified that the State of Arkansas receives more than $10,000 per year in federal funds pursuant to grants, contracts, subsidies, loans, guaranties, or insurance. Weiss testified that in 2009 the State of Arkansas received more than $5.4 billion in these types of funds, and that for each year from 2010 through 2013 the State of Arkansas received more than $6 billion in such federal funds. The jury could reasonably conclude from this testimony that the State of Arkansas receives "benefits" in excess of $10,000 each year from some form of federal assistance.

According to Weiss, the federal government disburses these funds directly to the affected agencies, so federal funds do not go into the state treasury. In contrast, Joseph C. Buddenberg, an auditor with the Division of Legislative Audit, testified that he has audited the treasurer's office for many years and that the monetary assets of the treasurer come from both state and federal sources. According to Buddenberg, state and federal funds are commingled in the state treasury and federal grant money is invested by the statute treasurer. Thus, the testimony of Buddenberg conflicted with that of Weiss on the issue of whether federal funds were deposited in the state treasury and were invested by the treasurer.

The jury could reasonably conclude that Buddenberg's testimony on this point was more reliable than that of Weiss. As an auditor, Buddenberg was responsible for tracing funds that were deposited into and disbursed from the state treasury. By virtue of his position, he had direct knowledge of whether federal funds were deposited into the state treasury, commingled with state funds, and invested in bonds. Weiss, in contrast, did not audit the state treasurer's office and did not have direct knowledge of whether federal funds were deposited into the state treasury, commingled with state funds, and invested in bonds. Without objection, the Court instructed the jury that they could believe all of what a witness said, a part of it, or none of it. The jury could believe Weiss's testimony that the State of Arkansas receives billions of dollars each year in federal funds, while disbelieving his testimony that no portion of those funds was deposited into the state treasury.

Shoffner relies on *Salinas v. United States*, 522 U.S. 52, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997), for the proposition that the statute is unconstitutional as applied to her because she had no connection to federal funds. In *Salinas*, the Court rejected the argument that the federal program bribery statute codified at 18 U.S.C. § 666 is limited to cases in which the bribe has a demonstrated effect upon federal funds. *Id*. at 54, 118 S. Ct. at 472. "The enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered, does not support the interpretation that federal funds must be affected to violate § 666(a)(1)(B)." *Id*. at 56-57, 118 S. Ct. at 473. Thus, "§ 666(a)(1)(B) does not require the Government to prove the bribe in question had any particular influence on federal funds . . . ." *Id*. at 61, 118 S. Ct. at 475.

Moreover, Shoffner's contention that the statute is unconstitutional as applied to her because the connection between any federal funds and the alleged bribery is too attenuated disregards Buddenberg's testimony. Buddenberg's testimony shows that federal funds were directly affected

by Shoffner's act of taking bribes in exchange for directing bond transactions to Stephens. While the government was not required to prove that the bribery here affected federal funds, such proof was nevertheless presented through Buddenberg.

## CONCLUSION

Underlying Shoffner's arguments is the sense that the charges against her belong in state court, not federal court. Perhaps so. Her crimes represent a breach of trust against the State of Arkansas much more than an injury to interstate commerce or a wrong against the federal government. But the United States Attorney, in the exercise of his prosecutorial discretion, presented the facts to a federal grand jury, which indicted her on charges of violating federal statutes. Congress had the authority, under the United States Constitution, to enact those statutes. At trial, the federal prosecutors proved, beyond a reasonable doubt, that Shoffner's conduct violated those statutes. This Court has no authority to overturn Shoffner's convictions simply because her crimes might be more appropriately prosecuted by the State of Arkansas. *Cf. United States v. Culbert*, 435 U.S. 371, 379-80, 98 S. Ct. 1112, 1116-17, 55 L. Ed. 2d 349 (1978).

Martha Ann Shoffner's motion for judgment of acquittal is denied. Document #72.

IT IS SO ORDERED this 15th day of April, 2014.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE